**WORTH MILLS v. COPELAND et al.**

No. 12294.

Court of Civil Appeals of Texas. Fort Worth.

May 31, 1930.

Rehearing Denied Oct. 11, 1930.

Cantey, Hanger & McMahon, of Fort Worth, for appellant.

Samuels, Foster, Brown & McGee, of Fort Worth, for appellees.

CONNER, C. J.

This suit was instituted by the Worth Mills, complaining of Rudy Copeland and the First National Bank of Fort Worth, on the 31st day of May, 1927. The facts as presented by the pleadings are substantially as follows: That the plaintiff is a corporation duly incorporated under the laws of Massachusetts, having a permit to do business in Texas; that it succeeded to the rights and properties of the Worth Mills, a Texas corporation now dissolved, and contracted to issue new stock to the bona fide stockholders of the Texas corporation, the stock of the corporations named to be exchanged in accordance with a plan of organization. As finally determined, it appears that the Worth Mills had issued 11,000 shares of preferred stock of the par value of $100 each, and 22,000 shares of common stock of the par value of $1 each; that Chas. L. Harding, president of the Pemaquid Mills of Massachusetts, and his associates subscribed and paid for $400,000 of the preferred stock; and the shareholders of the Texas corporation subscribed and paid for $500,000 of the preferred stock. The 22,000 shares of common stock above referred to was issued in the name of defendant Copeland, one-half to be disposed of as a bonus by delivering one share of common stock to each purchaser of preferred stock; that is, the purchaser of the preferred stock received one share of common stock with each share of preferred stock purchased; 11,000 shares of the common stock were purchased and paid for by the Pemaquid Mills of Massachusetts in accordance with the direction of Harding, its president; the remaining 11,000 shares of common stock was deposited with the defendant First National Bank of Fort Worth, in trust for distribution to purchasers of the preferred stock as above indicated. It appears that but 9,021 shares of preferred stock was sold, thus leaving 1,979 shares of common stock that had been deposited in the First National Bank undisposed of. It is these 1,979 shares of common stock that is in controversy in this suit.

It is the contention of appellant that the defendant Copeland held in his name the 22,000 shares of common stock in trust for distribution as above indicated, and that the 1,979 shares should now be canceled; while the defendant Copeland insists that the common stock issued in his name was bought and paid for by him, and that the 1,979 shares of common stock is his individual property. Defendant Copeland further alleged that under the plan of reorganization of the Texas corporation he became entitled to one share of preferred stock of the Massachusetts corporation of the par value of $15 for each share of common stock held by him in said Texas corporation, and that in addition thereto he was entitled to cash dividends declared on said preferred stock, amounting to $4,497.22; that none of the preferred stock of the Massachusetts corporation had ever been issued to him for the 1,979 shares held and owned by him; that at the date of its issuance the preferred stock in the Massachusetts corporation was worth on the market the par value thereof, but had declined since, and was worth only 50 per cent. of its par value; that, if he had received the preferred stock as contemplated under the reorganization plan, he could have sold the same for the full market value, to wit, $29,685, but that, by reason of the premises, the plaintiff was liable and bound to pay to him the decline in value. Defendant Copeland further alleged that the plaintiff was guilty of conversion of the preferred stock to which he was entitled, but which had never been delivered, and he sought to recover the market value thereof, together with the cash dividends amounting, as alleged, to $35,000.

Chas. L. Harding, of the Massachusetts group, who came to Texas to assist in the reorganization under consideration, was president of the Fairhaven Cotton Mills of Massachusetts, and later of the Pemaquid Mills. He testified to the effect that the Pemaquid Mills took over $400,000 worth of the preferred stock of the Worth Mills (4,000 shares), together with 4,000 shares of its common stock; that Mr. Copeland, Mr. Holmes, and the witness were the promoters of the contemplated new organization, who at first wanted the common stock to be divided one-half to the promoters and the other half to be used as bonus stock, giving one share to each share of preferred stock sold. But, on objection to this plan by Worth Mills stockholders, it was arranged that the promoters should pay $1.25

per share for the 22,000 shares of common stock, 11,000 shares to stand in Mr. Copeland's name to be given to purchasers of preferred stock. It was arranged that "we" (evidently the promoters) were to pay $2.50 a share for 11,000 shares. This plan was agreed upon by all parties, including the consulting lawyers of both sides. The machinery or method of working the plan out and putting it into execution was left to the lawyers. He testified:

"I know that the 1979 shares of common stock in controversy never was thought to belong to Mr. Copeland and he never thought so until afterwards. * * * I understand that the stock was issued in Copeland's name, being deposited in trust, he should have to account for it. It was put in his name for convenience. * * * The 22,000 shares of common stock was split in two, and 11,000 shares of it was left in Copeland's name, and Holmes and myself we got two thirds of the 11,000 shares; we were working for the Pemaquid Mills; that stock was made out to the Pemaquid Mills and we were acting for the Pemaquid Mills in all these matters. Copeland retained one third of the 11,000 shares of common stock, but he did not pay for it. * * * The 1,979 shares of stock involved in this suit are no part of the 11,000 shares of common stock that I claim we bought and paid for. * * * I don't know the law on the subject of whether Copeland is illegally in possession of the 1,979 shares of stock, but I will say that he is unjustly in possession of them. I know that. * * * I never agreed with Rudy Copeland that he should have the 11,000 shares of bonus stock or any part of it. * * * As the president and as a director of the Massachusetts corporation, I would not have agreed to the taking over of the Worth Mills of Texas if I had known that we would have to issue preferred stock to Rudy Copeland, in the Massachusetts Corporation for the 1,979 shares."

Mr. John P. King, one of the stockholders of the Texas corporation who participated in the reorganization, testified, among other things, that he understood that the unsold stock was to be canceled; that the common stock was placed in Copeland's name for "legal reasons"; that he never heard Copeland claim, until afterwards, that he ever paid a dollar for the common stock. * * * It was never contemplated that Copeland would ever own any part of the common stock of the Worth Mills except such stock as he might buy as the rest of us bought it."

Lloyd H. McKee, who participated in the reorganization, testified in behalf of defendant Copeland that one share of common stock was to be given with each share of preferred sold; that 11,000 shares of common stock was to be divided three ways, that is, between Holmes, Harding, and Copeland; that the common stock, the 22,000 shares, was sub-scribed for in the name of Copeland and was paid for by Copeland; that the sum of $27,500 was paid therefor, but that Copeland had the 22,000 shares of common stock subject to the arrangement and agreement to give one share of common stock with each share of the preferred stock. He further testified, in substance, that whatever sum was paid for the common stock they (Holmes, Harding & Copeland) were to get 11,000 shares, and that the other 11,000 shares were to go "as a bonus." He further testified: "I never heard and nobody else ever heard that they would own individually but 11,000 shares of the common stock and the only purpose of issuing the other 11,000 shares was to give it with the preferred stock."

He further testified that he did not know that the $27,500 drawn on the Pemaquid Mills had been deposited to Copeland's credit.

Mr. Sidney Felton, who as attorney was representing Mr. Harding and others, testified to the effect that there never was any agreement that Mr. Copeland for his own account should subscribe to any stock; that that suggestion was made that it might be simpler in getting the charter of the new corporation if the $27,500 which the Pemaquid Mills was going to pay was allowed to stand for the nominal consideration for the issue of the entire capital stock; that that would result in the issue of 22,000 shares, of which 11,000 shares was to be all that the organizers or promoters (Holmes, Harding & Copeland) would be entitled to, and that the other 11,000 shares should be set aside, and either placed in the bank's name or in the name of the company or placed in some form so that it would be available for use as bonus shares; that it was stated at that time that that did not change the fundamental plan, which was that the New England interests on the one hand, and Mr. Copeland on the other, should have an interest only in the 11,000 organizers' shares, and that the other 11,000 bonus shares should go only to the people who came and put up $100 a share for the preferred stock; that they would get the bonus shares; that at that time there was no statement or suggestion that the entire 11,000 shares of preferred stock would not be sold; that "it was agreed that the Pemaquid Mills should buy whatever shares of stock were bought and Mr. Harding's suggestion was that they buy 11,000 shares and then, the attorneys interpolated the theory to let it just go as payment for 22,000 shares. * * * That the first suggestion made was that the Pemaquid Mills should subscribe in its own name, and then, either Mr. Harding or it may have been Mr. Copeland, pointed out that there might be some inconvenience in that; that the Pemaquid Mills would not be down here at Fort Worth and there would not be any officer of the Pemaquid in Fort Worth and if the stock

was placed in the name of the Pemaquid Mills, it would not be as convenient for future purposes and it had already been stated that Mr. Copeland was acting for and was going to act for the Pemaquid Mills, and it was suggested that it might be very convenient to have Mr. Copeland take this stock in his own name, but in the capacity as agent for the Pemaquid Mills. * * * In none of those conversations did Mr. Copeland ever claim that he, himself, owned this common stock. Mr. Copeland never, in any conversation, with me, or letter or telegram, claimed that he had for himself, subscribed for or paid for one dollar of the common stock, but many times he said, 'I want to do and I am going to do what you tell me; I am representing you; of course, I have got to consider how the Fort Worth people will feel about what you want me to do; I have got to advise you on that; that is my job, but I am here to follow instructions.' "

Mr. Copeland testified to the effect that the plan agreed upon was that he should buy all of the common stock for $1.25 per share, and that he was to give a share of stock free with each share of preferred stock, and that he was to have one-third of one-half, and that Holmes and Harding were to have two-thirds of one-half, but that Holmes and Harding were to pay him (Copeland) the sum of $27,500 for two-thirds of one-half. He further testified to the effect that he carried out the arrangement of issuing or having transferred a share of common stock to each purchaser of the preferred stock, and that such instructions were given to the First National Bank, designated as transfer agent, upon information received from the secretary of the company. He further testified that he gave his note to the Pemaquid Mills for a sum equal to one-half of one-third of $27,500; that "my trade with Mr. Harding and Mr. Holmes was that I was not to pay one cent. Mr. Harding was to pay me $27,500.00 for two-thirds of the 11,000 shares, which was the exact amount that I was to pay for the entire 22,000 shares. This was for the purpose of providing me with my stock absolutely free, in accordance with the agreement with the Fort Worth group when we organized the mill, as compensation for my services."

He further testified that the note given by him for his one-third of the 11,000 shares of stock had no connection with the 1,979 shares in controversy. He further testified that:

"With reference to the 1,979 shares of stock I was restrained by this suit, and therefore, I have not yet received from the Worth Mills of Massachusetts the preferred stock which I have the right to elect to take under the plan of reorganization in exchange for the 1,979 shares of common stock in the old corporation. As a part of these 1,979 shares of common stock and the First National Bank of

Fort Worth, the transfer agent, has a part of them. I understand that the First National Bank of Fort Worth, the transfer agent, was joined in this suit by the plaintiff, but I have never seen the pleadings."

It also appears that the 11,000 shares of common stock to go to the promoters was forwarded to the Pemaquid Mills and to be owned two-thirds of it by Harding and Holmes and one-third by Copeland; Copeland executing a note for his one-third of the block of stock. It further appears without dispute that Copeland paid for the 22,000 shares of common stock with a draft for $27,500 drawn upon and paid by the Pemaquid Mills of Massachusetts.

The statement of facts as a whole is quite voluminous, covering some 269 pages of the usual transcript paper, and we have only stated such parts thereof, in substance, as we think necessary to illustrate the conclusion to which we have come.

In the condition of the evidence as we have indicated it, the court submitted the case to the jury upon three special issues, which, together with the answers of the jury, are as follows:

"1. Was it agreed by the defendant Copeland and Harding and the other parties to the transaction that the $27,500.00 which was paid for common stock was in payment for eleven thousand shares of such stock at $2.50 per share? Answer: No.

"2. Was it agreed by Copeland and Harding and the other parties to such transaction that said Copeland, for himself, was purchasing the twenty-two thousand shares of common stock and paying therefor $1.25 per share? Answer: Yes.

"3. Did defendant Copeland sell to C. L. Harding and Charles L. Holmes 7,334 shares of common stock for the sum of $27,500.00? Answer: Yes."

Appellant objected to these issues, on the ground that they were vague and indefinite, and unfair to the plaintiff, and did not submit the case as alleged in plaintiffs' petition.

Appellant also presented numerous special instructions which were refused, of which we quote the following:

"Special Issue No. 5: Was defendant Copeland representing Harding and the Pemaquid Mills or either in subscribing for the common stock?

"Special Issue No. 6: Was it intended by the parties that any part of the bonus stock should belong to the promoters?

"Special Issue No. 7: Did Copeland hold the eleven thousand shares of bonus stock in trust for the benefit of the purchasers of preferred stock?

"Special Issue No. 8: Was it the intention of the promoters that any of the parties should retain for their own use and benefit any surplus of the eleven thousand shares of bonus stock remaining out of the original eleven thousand shares of bonus stock if the entire eleven thousand shares of preferred stock were not sold?

"Special Issue No. 9: Was it the intention of the promoters to use the eleven thousand shares of common stock for bonus stock only?"

Appellant's objections to the issues submitted and the request to submit the special issues were overruled, and, upon the verdict of the jury, and uncontroverted evidence, as recited by the court, the court entered judgment dissolving the temporary writ of injunction theretofore issued restraining the disposition of the 1,979 shares of common stock in controversy, and awarded Copeland judgment upon his cross plea for the sum of $26,063.43 as damages for the conversion by the plaintiff of the preferred stock to which Copeland had alleged he was entitled in exchange for the 1,979 shares of common stock; it being further ordered that upon the payment of the judgment, the common stock in controversy should become the property of the Worth Mills of Massachusetts free of any claim or lien or right upon the part of defendant Copeland.

To the judgment so rendered the appellant corporation duly excepted and has prosecuted this appeal, and presents numerous assignments of error. It is not clear, we think, that the issues given by the court sufficiently call for conclusions of the jury on all the vital questions presented by the pleadings and evidence. A careful consideration of the evidence has led us to the conclusion that the issues submitted by the court are too indefinite and general and lead to inconclusive answers, and that the special issues mentioned at least should have been given to the end that the vital issues as presented in appellant's pleadings and evidence might be determined by the jury. It is to be remembered that as to the cross-action of appellee Copeland the appellant was in the position of defendant, and as such was entitled to a clear-cut and affirmative presentation of its defenses. Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517; St. L. S. W. Co. v. Johnson, 100 Tex. 237, 97 S. W. 1039; Campbell v. Johnson (Tex. Com. App.) 290 S. W. 526. Even in cases in which a material issue is presented in behalf of one of the litigants affirmatively, his adversary is entitled to have the same issue presented in its negative form. See Gammage v. Gamer Co. (Tex. Com. App.) 213 S. W. 930. We are accordingly of the opinion that the assignments of error complaining of the issues submitted and of the court's refusal to submit special issues must be sustained and the judgment reversed and the cause remanded for a new trial.

In view of another trial, however, we should perhaps add that we find no error in the action of the court in overruling the general demurrer to appellee's plea or cross-action for the recovery of damages for conversion of the 1,979 shares of the preferred stock in the appellant corporation and for unpaid dividends alleged to be due thereon. However, it does not seem clear to us that the letter or telegram written by Chas. Harding to Copeland from Boston, Mass., under date of March 9, 1927, complained of in appellant's 10, 11, 12, 13, 14, 15, and 16 propositions, should have been admitted in evidence. It does not appear that the proposition presented in the letter was ever followed up by performance or authorized by the appellant corporation. The telegram thus appears to be irrelevant. Nor do we see the relevancy of Lloyd McKee's statement to the effect that the reason why the common stock was not reduced, as was the preferred, was that Mr. Smith, the attorney at the time, said it could not be done without injuring the outstanding indebtedness. The undisputed fact is that the common stock was not reduced, and the reason why does not seem to be material. If not relevant, this testimony would tend to confuse rather than clarify an already complicated state of facts, and the same reason applies to the telegram above referred to. We also think the testimony of Mr. Copeland, objected to in appellant's bill of exception No. 10, giving a conversation had with Mr. Harding, is objectionable as self-serving. In the conversation referred to, he gave as a reason why he had not paid the note given by him for one-third of the 11,000 shares of common stock sent to the Pemaquid Mills was that Mr. Harding had not complied with the agreement in creating the machinery, etc., delivered by said mills in payment, or part payment, of the preferred stock.

Other questions will perhaps not be presented on another trial, and without further discussion we think the judgment below must be reversed and the cause remanded for the reasons given.

On Motion for Rehearing.

The able counsel for appellee earnestly and with apparent force insist that the motion for rehearing should be granted and the judgment below affirmed, for the reason, as insisted, that the undisputed evidence shows that Copeland was entitled to recovery.

We have at all times been unable to so construe the evidence set out in our original opinion, and perhaps more fully set out in appellant's reply to the motion for rehearing. While it is true that the Texas corporation issued the 22,000 shares of common stock,

and that Copeland paid the purchase price therefor, yet the money paid by him was furnished by parties acting for the Massachusetts corporation, who testified that the purchase was for reorganization purposes, and that Copeland was to hold and dispose of the stock as a trustee. If it was his individual property, why did he send 11,000 shares of it to parties acting for the Massachusetts corporation, and give his note for one-third of the stock? And why did he deposit the remaining 11,000 shares with the bank to be given away to purchasers of shares of the preferred stock in the Massachusetts corporation? Are we required to believe that in so doing he was prompted by altruistic purposes? We think not. On the contrary, we think there was evidence at least tending to show that Copeland had but the naked legal title in the bonus stock, the beneficial interest being in the appellant corporation, or at least that he was without such right as entitled him to the judgment he recovered under his cross-action.

■ But it is urged that the special charges requested were insufficient, and that appellant's assignments of error are in violation of the court rules, and should be disregarded. While it may be true that the criticisms relating to the requested charges and assignments are well grounded, yet if, under assignments that require of us an examination of the record, we discover an error of fact or law which has resulted in a miscarriage of justice, we conceive it to be our duty to right the wrong. Article 1844, Rev. Civ. Statutes of 1925, expressly provides that an assignment of error "shall be sufficient which directs the attention of the court to the error complained of." In Morrison v. Neely, 231 S. W. 728, by section B of the Commission of Appeals, it was held, in effect, that assignments of error sufficient to direct the court's attention to the fact that appellant claimed that the evidence was not sufficient to support the judgment required the determination of whether the evidence was sufficient to support the finding of fact of the trial court, though the assignments did not directly and specifically attack the finding of fact.

In Graves v. Haynes, 231 S. W. 383, 385, by section A of the Commission of Appeals, specially approved by the Supreme Court, a requested charge, declared to be "not technically correct in every particular," was sufficiently so as to require the court to give a proper charge on the subject.

We accordingly feel unwilling to affirm the judgment in appellees' favor, in the absence of a submission of a clear presentation of the material issues in the claim and a clear-cut verdict thereon in appellees' favor.

The motion for rehearing will accordingly be overruled.